NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### TAMPA DIVISION

RHONDA JORDAN,

                      **Plaintiff,**

v.                                       **Case No.   8:13-cv-2305-T-33KRS**

COMMISSIONER OF SOCIAL
SECURITY,

                      **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

       This cause came on for consideration without oral argument on the Complaint filed by

Plaintiff Rhonda Jordan seeking review of the final decision of the Commissioner of Social

Security denying her claim for social security benefits, Doc. No. 1, the answer and certified copy

of the record before the Social Security Administration ("SSA"), Doc. Nos. 13, 14, and the

parties' Joint Memorandum, Doc. No. 20.[1]

### PROCEDURAL HISTORY.

       In 2010, Jordan filed applications for benefits under the Federal Old Age, Survivors and

Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401, *et seq.*, and under the Supplemental

Security Income for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. § 1381, *et seq.*

---

[1] The undersigned required counsel for the parties to submit a single, joint memorandum with an agreed statement of the pertinent facts in the record. Doc. No. 15. Counsel for Plaintiff was ordered to identify and frame, in a neutral fashion, each of the disputed issues raised as grounds for reversal and/or remand, and counsel for the Commissioner was required to respond to each of those issues in the format set forth in the Revised Scheduling Order. *Id.*

(sometimes referred to herein as the "Act").   She alleged that she became disabled on May 24, 2010.   R. 133, 140.

After the applications were denied originally and on reconsideration, Jordan asked for a hearing before an Administrative Law Judge ("ALJ").   R. 99.   An ALJ held a hearing on November 30, 2011.   Jordan, accompanied by an attorney, and a vocational expert ("VE") testified at the hearing.   R. 47-66.

After considering the hearing testimony and the evidence in the record, the ALJ found that Jordan was insured under OASDI through December 31, 2015.   The ALJ concluded that Jordan had not engaged in substantial gainful activity since May 24, 2010, the alleged disability onset date.   R. 28.

The ALJ found that Jordan had obesity; degenerative disc and joint disease in the lumbosacral spine; Tarlov cyst[2]; and, degenerative disc disease in the cervical spine, which were severe impairments.   *Id.*   These impairments did not meet or equal a listed impairment.   R. 30. The ALJ concluded that Jordan's other alleged impairments, including mental impairments, were not severe.   R. 29-30.

The ALJ determined that Jordan had the residual functional capacity ("RFC") to perform the full range of sedentary work.   R. 30.   The ALJ found that Jordan's subjective complaints were not credible to the extent they were inconsistent with this RFC finding.   R. 31.

---

[2] Tarlov cysts are sacs filled with fluid that most often affect nerve roots in the sacrum.   If the cyst compresses nerve roots, it may cause lower back pain, sciatica, urinary incontinence, headaches and some loss of feeling or control of movement in the leg and/or foot, among other things.   R. 285.

Based on the testimony of the VE, the ALJ found that Jordan could return to her past relevant work as a customer sales representative.   R. 34.   Accordingly, the ALJ concluded that Jordan was not disabled.   R. 35.

Jordan sought review of the ALJ's decision by the Appeals Council.   R. 11.   On July 10, 2013, the Appeals Council found no reason to review the ALJ's decision.   R. 1-3.

Jordan now seeks review of the final decision of the Commissioner by this Court.

## JURISDICTION AND STANDARD OF REVIEW.

Jordan having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).   A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## SUMMARY OF THE FACTS.

After a thorough review of the record, I find that the relevant facts are adequately stated in the parties' agreed Statement of Facts in the Joint Memorandum.   Therefore, I will only summarize facts pertinent to the issues raised to protect Jordan's privacy to the extent possible.

Jordan was born in 1966.   R. 50.   She completed school through one year of college. R. 52.   At the time of the ALJ's hearing, Jordan was 5'8" tall and weighed 199 pounds.   R. 51.

Jordan last worked in October 2011 in a customer service job for seven days.   R. 52.   She could not tolerate the pain in her back after sitting for eight hours.   She also was not allowed to go to the restroom every hour as needed, which resulted in her having urinary incontinence

3

Not for Publication

accidents at work.   R. 53.   She had previous customer service work at PODS and PSC Financial.

R. 54, 63-64, 177.   In a Work History Report, Jordan indicated that her jobs in customer service

required her to sit for eight hours a day and that she was not required to perform any lifting.

R. 179-80.   The VE testified that Jordan's customer service work was sedentary, semi-skilled

work.   R. 63.   The ALJ did not ask the VE whether Jordan could perform that work in light of

the ALJ's RFC assessment.[3]

At the ALJ's hearing, Jordan testified that she could not sustain a job due to pain in her

back, numbness in her legs, uncontrollable incontinence and shaking.   R. 55.   She fell every day.

R. 61.   She also had migraine headaches about twice a month lasting about seven days each,

which had become more severe.   R. 56-57.   She estimated that she could sit fifteen minutes to

one hour before needing to change position due to back pain and spasms.   She could stand

without holding onto something only a few minutes.   She could climb only a couple of stairs.   R.

58-59.   She could lift up to five pounds.   R. 59.   She had difficulty grocery shopping and

completing household chores.   R. 59-60.   She needed to use the restroom at least once an hour,

but even then she could not control her bladder sufficiently to ensure that she did not have urinary

incontinence accidents.   R. 61-62; *see also* R. 225 (written report indicating that Jordan had to

use the bathroom several times during the day due to overactive bladder).

Jordan sought treatment from Colin Chan, M.D., in December 2008 following a motor

vehicle accident.   She complained of right knee and ankle pain and coccyx pain.   R. 494 (Exhibit

---

[3] In response to questions from Jordan's attorney during the ALJ's hearing, the VE testified that if a hypothetical person would be away from the workstation at least once an hour due to urinary incontinence or pain, the individual probably would not be employable in the competitive market.   R. 65. Similarly, if the individual had to leave the workstation for multiple, unscheduled breaks during the workday to use the restroom, the person would not be able to keep a job and continue to work.   *Id.*

7F).   An MRI revealed that Jordan had a bulging disc in her neck and a tear in an area in her back.   Dr. Chan's diagnosis was severe lower back pain.   R. 488.   Pain medication was not effectively relieving Jordan's pain.   *Id.*   Jordan's complaints of back pain continued through 2010.   R. 448-88.   She also complained of incontinence, gastritis, bipolar disorder, anxiety and depression, among other ailments.   Doc. No. 20 at 2 (citing to record evidence of these complaints); R. 439, 448-88, 502.

On March 25, 2009, Jordan reported that she was drinking ten bottles of water and one can of soda daily.   R. 476.   On June 21, 2010, she indicated that she was not drinking any water, although she drank juice, tea and soda.   R. 399.   On July 9, 2010, she indicated that she had started bed wetting and was wearing diapers.   R. 397.

An MRI taken in May 2010 revealed an asymmetric right-sided SI joint degeneration with mild reactive adjacent changes, bilateral foraminal L4-L5 annular tearing and L5-S1 facet degeneration.   R. 426.   The radiologist opined that no significant degenerative changes were evident.   R. 427.   A treatment note from Dr. Chan's office dated May 17, 2010, noted that Jordan sat to one side and walked with an antalgic gait.   R. 451.   She also complained of urinary incontinence.   R. 450.

On May 31, 2010, Jordan sought emergency department treatment at Bayfront Medical Center for increasing back and right hip pain and paresthesia of the right leg making it difficult for her to walk and causing falls.   R. 405-06 (Exhibit 6F).   Giovanni M. Baula, M.D., noted on examination that Jordan had tenderness to palpation over the coccyx area.   His impressions

NOT FOR PUBLICATION

included intractable back pain, gastroesophageal reflux disease, gastritis, bipolar depression and anxiety.   He admitted her to the hospital.   R. 406.[4]

On June 4, 2010, Jordan was transferred to St. Anthony's Skilled Nursing Facility for rehabilitation.   R. 319-20 (Exhibit 4F).   She was discharged to home health care on June 15, 2010, with a prescription for a 3-1 commode.   R. 321.   Jordan had in-home physical therapy through July 16, 2010.   R. 312-75.   As of June 21, 2010, Jordan had developed a foot drop in her right leg and used a walker to ambulate.   R. 442, 446.   On June 24, 2010, the physical therapist wrote that Jordan was very unsteady and needed assistance to get up and walk.   R. 343.   On June 29, 2010, a therapist's note reflects that Jordan's left foot drop was improving.   R. 340.   A physical therapist's treatment note from July 6, 2010, reflects that Jordan had increased pain and was unable to do many exercises.   Jordan needed a walker because she was very unsteady.   R. 335.   Jordan missed some physical therapy sessions.   R. 333, 336, 339, 344-46.   In July 2010, Jordan refused physical therapy because she was having extreme pain in her legs.   R. 324.   Dr. Baula discharged Jordan from home health services on July 13, 2010.   R. 349.   At that time, it appears that Jordan was able to ambulate with a walker.   R. 352.

Meanwhile, Jordan was examined at West Florida Pain Management on June 23, 2010. R. 300-03 (Exhibit 2F).   The diagnoses were thoracic or lumbosacral neuritis or radiculitis and displacement of a lumbar intervertebral disc without myelopathy.   The treatment provider, whose name is not included in the records, wrote that this information was related to Dr. Chan's office. R. 303.

---

[4] Gerald Trimble, M.D., was one of Jordan's treating physicians at Bayfront Medical Center. R. 524.

NOT FOR PUBLICATION

On July 15, 2010, Steven R. Cohen, M.D., at Suncoast Medical Central Neurology, examined Jordan on referral from Dr. Chan. R. 394 (Exhibit 6F). Jordan reported a burning pain radiating from hip to hip across her back and occasionally radiating down her legs with numbness in her right foot. She indicated that she had an injection in her hip while hospitalized and that she had not been able to move her right leg since receiving the injection. She also had some urinary incontinence. In addition, an MRI revealed a large cyst in her sacrum that was most likely a Tarlov cyst. Dr. Cohen indicated that the cyst was too low in the sacrum to explain Jordan's leg weakness. She also had central disc bulging at L4-5 and L3-4. *Id.* Upon examination, Dr. Cohen observed that Jordan's right leg was completely immobile although he observed some movement of the leg and foot when Jordan got on and off the examination table. R. 395. Jordan could not walk without assistance. A nerve conduction study and electromyography were normal. Dr. Cohen's impression was that he was dealing with a conversion disorder,[5] but he also ordered further radiologic tests of the lumbar and thoracic spine. R. 396.

Dr. Cohen saw Jordan again on August 5, 2010. The new radiologic studies confirmed that she had a benign Tarlov cyst. Dr. Cohen opined that Jordan's pain was "much different than

---

[5] Conversion disorder or conversion reaction is a somatoform disorder characterized by symptoms or deficits affecting voluntary motor or sensory functioning and suggesting physical illness but produced by conversion. A person's anxiety is "converted" into any of a variety of somatic symptoms such as blindness, deafness, or paralysis, none of which have any organic basis. The anxiety may be the result of an inner conflict too difficult to face, and symptoms are aggravated in times of psychological stress.

*Lewis v. Astrue*, No. 4:08cv441-RH/WCS, 2009 WL 3256018, at *11 n.11 (N.D. Fla. Oct. 6, 2009) (citing Dorland's Medical Dictionary for Healthcare Consumers).

just pain in the sacrum which is what one would expect from this particular cyst."   R. 391.   It

was, therefore, not possible that the Tarlov cyst was causing Jordan's leg weakness.   Dr. Cohen

again indicated that the weakness was a conversion or somatization disorder. R. 391-92.

Jordan sought emergency department treatment on August 4, 2010, due to lower back pain

(Exhibit 5F).   R. 378.   The treatment notes reflect that spasms and tenderness were observed in

the lower back.   R. 380.   The assessment was lumbosacral strain following a motor vehicle

collision.   R. 382.

On August 9, 2010, Robert J. Kowalski, M.D., examined Jordan.   He observed that

Jordan's motor strength was 5/5 in her lower extremities.   She had decreased sensation in her left

leg and foot.   He observed exquisite tenderness in the upper lumbar region, but Jordan had no

pain on full range of motion.   His assessment was degeneration of the lumbar or lumbosacral

intervertebral disk, thoracic or lumbosacral neuritis or radiculitis, lumbar myofascial pain, a

sacrum Tarlov cyst, footdrop and muscle weakness.   R. 526 (Exhibit 8F).

On August 11, 2010, Luis G. Figueroa, M.D., at the Florida Spine Institute, examined

Jordan at the request of Dr. Kowalski.   Jordan reported loss of control of her right leg, resulting

in many falls, and diffuse back pain aggravated by general activity and by sitting and standing for

an extended period of time.   R. 517 (Exhibit 8F).   She was also unable to control her bladder.

R. 519.   Upon examination, Dr. Figueroa observed a flicker of movement of Jordan's right foot.

She was able to stand from a sitting position in a wheelchair with great difficulty.   Dr. Figueroa

described her gait as "bizarre."   *Id.*   Dr. Figueroa reviewed previous radiologic studies.   He

opined that MRI findings of an asymmetric disc bulge with associated annular tear could not

explain the recurrent falls and reported right lower extremity symptoms.   *Id.*   He wrote, "If

symptomatic, the sacral Tarlov cyst described could contribute to local bone pain or conceivably a right S2 radiculopathy." R. 518. Dr. Figueroa's assessment was lumbar myofascial pain and gait disturbance. He did not find obvious evidence of an evolving neurological disorder. He recommended that Jordan follow-up with her treating psychiatrist and indicated that her options were primarily in the realm of pain management. R. 519.

On September 28, 2010, Keith Bauer, Ph.D., prepared a Psychiatric Review Technique form based on review of Jordan's records. He found that Jordan's mental impairment was not severe because it would result in no restrictions in activities of daily living, only mild difficulties in social functioning and maintaining concentration, persistence and pace and no episodes of decompensation of extended duration. R. 533-46 (Exhibit 9F). This opinion was subsequently affirmed by J. Patrick Peterson, Ph.D., J.D. R. 547 (Exhibit 10F).

On November 18, 2010, Efren Baltazar, M.D., prepared a physical functional capacity assessment form after review of Jordan's records. Dr. Baltazar opined that Jordan could lift up to 10 pounds occasionally and less than 10 pounds frequently. She could stand at least 2 hours and sit about 6 hours in an 8-hour workday. She could occasionally engage in postural activities but never climb ladders, ropes and scaffolds. She should avoid concentrated exposure to vibration and hazards. R. 548-55 (Exhibit 11F).

Jordan sought treatment at Pinellas County Health Services in November 2010. R. 563 (Exhibit 12F). Upon examination, Chitra X. Ravindra, M.D., observed tenderness in the lower lumbar spine with a straight-leg raising test positive in both legs at 10 degrees. She also treated Jordan for urinary incontinence, bipolar disorder, depression, anxiety and chronic hip and lower back pain. R. 560. In December 2010, Leslie M. Kidd, M.D., prescribed different medication

NOT FOR PUBLICATION

for back pain and anxiety.   R. 559.   In February 2011, Jordan reported dizziness and migraines.

Dr. Kidd observed that Jordan walked with an unsteady gait.   R. 557.

Edwin Jackson, M.D., treated Jordan at Suncoast Center for Community Mental Health,

Inc.   In April 2011, Jordan reported that she was much better, having withdrawn from the use of

opioids and using only small amounts of Xanax.   Her thought content and thought processes

were within normal limits, and her insight and judgment were fair.   Nevertheless, Dr. Jackson's

impression was that Jordan suffered from major depression, opioid dependence and

benzodiazepine dependence.   He continued to treat Jordan with medication.   R. 571 (Exhibit

13F).

Records reflect that Jordan was treated for injuries after a fall in September 2011.

R. 628-42.   Thomas C. Perrin, M.D., released Jordan to return to work on September 30, 2011,

with restrictions of no lifting over 10 pounds and sitting 100% of the time.   R. 645 (Exhibit 16F).

## ANALYSIS.

Jordan asserts five assignments of error, some of which are intertwined with other

assignments of error.   She contends that the ALJ erred by failing to consider her impairments and

symptoms in combination, substituting his opinion for that of the medical professionals, failing to

discuss and state the weight given to the opinions of several treating and examining professionals,

not articulating specific and adequate reasons to support his credibility finding and failing to

develop the duties of Jordan's past relevant work.   I will begin with the issue regarding the

weight given to the opinions of treating and examining professionals, because I recommend that

the Court find this issue to be dispositive.

NOT FOR PUBLICATION

*Weight Given to Treating and Examining Physicians.*

In this circuit, an ALJ must state with particularity the weight given to different medical opinions and the reasons therefor. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (citing *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987) (per curiam)). "'Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), . . . and [the claimant's] physical or mental restrictions.'" *Id.* at 1178-79 (quoting 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)). So, for example, in *Winschel*, the Eleventh Circuit found that the ALJ erred by failing to discuss pertinent elements of treating and examining physicians' medical opinions. *Id.* at 1179. In the absence of a statement of the weight given to different medical opinions and the reasons therefore, the Court may not affirm the Commissioner's decision "'simply because some rationale might have supported the ALJ's conclusion.'" *Id.* (quoting *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984) (per curiam)).

Jordan asserts that the ALJ failed to state the weight given to the opinions of Drs. Chan, Trimble, Baula, Ravindra and Kowalski, each of whom was a treating or examining physician. This argument is supported by the ALJ's decision. The ALJ did not mention the names of any of these physicians or state the weight given to their opinions. The ALJ was aware that he was required to state the weight given to opinions, as reflected by his indication of the weight given to other opinions. *See, e.g.*, R. 29, 33-34.

The Commissioner argues that none of these physicians provided opinions. This argument is contrary to the decision in *Winschel*, which explicitly states that treatment notes contain medical opinions when they include a statement of the claimant's symptoms and

11

diagnoses.   631 F.3d at 1179.   In *Winschel*, the Eleventh Circuit overruled the District Court's

opinion that treatment notes that did not include functional capacity assessments were not medical

opinions.   *See Winschel v. Comm'r of Soc. Sec.*, Case No. 6:08-cv-1750-DAB, Doc. No. 16 at 4-

5 (M.D. Fla. Dec. 14, 2009).

    The Commissioner also asserts that the ALJ considered the treatment notes of each of

these physicians, as reflected by the ALJ's reference to the exhibit numbers containing the records

prepared by these physicians.   Even if this general reference to exhibit numbers in the record

were sufficient to satisfy the *Winschel* requirements, the decision does not reflect that the ALJ

considered all of the records of these physicians.   For example, Dr. Chan treated Jordan from

December 2008 through 2010.   The ALJ referenced only two entries from Exhibit 7F, which

contains Dr. Chan's treatment notes: one about Jordan's indication of how much fluid she drank;

and, one about Jordan obtaining pain medication from friends.   R. 32-33.   The ALJ referenced

only two entries from Exhibit 12F, which contains Dr. Ravindra's treatment notes: one reference

to a treatment note written by Dr. Kidd; and one general reference to findings on examination that

are not found in Dr. Ravindra's treatment notes.   R. 29, 33.   The ALJ did not acknowledge, for

instance, Dr. Ravindra's finding in November 2010 that Jordan had tenderness in the lower

lumbar spine with a positive straight-leg raising test in both legs at 10 degrees.   R. 560.

Similarly, the ALJ's only reference to Exhibit 8F, which contains Dr. Kowalski's treatment notes,

is a reference to a treatment note in that exhibit prepared by Dr. Figueroa.   R. 32.

    Finally, the Commissioner asserts that any error arising from failure to state the weight

given to the opinions of these physicians is harmless because, among other things, Jordan has not

carried her burden of showing why the ALJ's decision was contrary to the opinions of these

doctors.   *See, e.g.*, Doc. No. 20 at 30-31.   While the Commissioner is correct that the claimant bears the burden of establishing disability, it is the Commissioner, through the ALJ, who is required to state the weight given to acceptable medical sources and reasons therefor.   The Commissioner's attorneys cite no authority supporting the proposition that they can shift this requirement to the claimant in order to excuse an ALJ's failure to follow the governing law.

It is possible that the ALJ considered the opinions of each of these physicians and found that they did not support functional limitations not included in the ALJ's RFC assessment. "[B]ut without clearly articulated grounds for such a rejection, we cannot determine whether the ALJ's conclusions were rational and supported by substantial evidence."   *Winschel*, 631 F.3d at 1179.   Accordingly, I recommend that the Court find that the Commissioner's final decision should be reversed based on this assignment of error.

*Credibility and Subjective Symptoms.*

In several of the remaining assignments of error, Jordan argues that the ALJ erred by failing to credit her complaints of debilitating pain and other subjective symptoms, including urinary incontinence and anxiety.   If an ALJ decides not to credit a claimant's testimony as to pain and other subjective symptoms, he must articulate explicit and adequate reasons for doing so. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995) (per curiam).

Jordan argues, initially, that the ALJ erred by finding no nonexertional limitations arising from her Tarlov cyst.   The ALJ found the Tarlov cyst to be a severe impairment at step two of the sequential evaluation.   R. 28.   In later steps in the analysis, the ALJ reviewed the limitations allegedly arising from the Tarlov cyst and stated evidence in the record that undermined Jordan's testimony about functional limitations arising therefrom.   R. 32.   The ALJ similarly addressed

13

Jordan's other complaints of subjective symptoms and cited evidence in the record supporting the conclusion that Jordan's complaints were not entirely credible.   R. 29-31.   Because the ALJ articulated specific and adequate reasons for the credibility finding, which reasons are supported by the record, I recommend that the Court find this assignment of error not well taken.

*Mental and Physical Demands of Past Relevant Work.*

Finally, Jordan complains that the ALJ did not adequately develop the demands of her past relevant work.   This argument fails on the present record because the ALJ concluded that Jordan did not have any nonexertional limitations and the VE testified that her past customer service work was sedentary, which is consistent with the ALJ's RFC finding.   Nevertheless, on remand, the Commissioner should require the ALJ to comply with the law by developing the physical and mental demands of Jordan's past relevant work if the ALJ concludes that Jordan can return to that work.   *See, e.g.*, *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987).

## RECOMMENDATION.

For the reasons stated above, it is **RESPECTFULLY RECOMMENDED** that the final decision of the Commissioner be **REVERSED** and that the case be **REMANDED** for further proceedings.   I further **RECOMMEND** that the Court direct the Clerk of Court to issue a judgment consistent with its ruling on this Report and Recommendation and, thereafter, close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from

NOT FOR PUBLICATION

attacking the factual findings on appeal.

Respectfully recommended this 21st day of November, 2014.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Presiding District Judge
Courtroom Deputy Clerk
Counsel of Record